UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

```
------------------------------------------------ x
                                            :
                                            :
                                            :
IN THE MATTER OF THE APPLICATION OF         :
WP COMPANY LLC d/b/a THE                    :
WASHINGTON POST FOR ACCESS TO               :
CERTAIN SEALED COURT RECORDS                :
                                            :
                                            :
                                            :
------------------------------------------------ x
```

Miscellaneous Action No. _____

ORAL HEARING REQUESTED


**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR PUBLIC ACCESS
<u>TO CERTAIN SEALED COURT RECORDS</u>**

Laura R. Handman
Eric J. Feder (*pro hac vice pending*)

DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, D.C. 20006
Tel: (202) 973-4200
Fax:  (202) 973-4499
Email:  laurahandman@dwt.com
Email:  ericfeder@dwt.com

*Attorneys for Petitioner WP Company d/b/a
The Washington Post*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................... 4

     A.      Public Interest in the Election Investigations............................................. 4

     B.      Procedural Posture ..................................................................................... 9

ARGUMENT ...................................................................................................................... 10

    I.      THE PUBLIC HAS A QUALIFIED RIGHT OF ACCESS TO THE
           SEALED WARRANT MATERIALS UNDER BOTH THE FIRST
           AMENDMENT AND THE COMMON LAW.................................................... 10

     A.      There is a First Amendment Right of Access to Search Warrant
           Materials .................................................................................................. 10

     B.      There Is a Common Law Right to Inspect Judicial Records, Including
           Search Warrant Materials ......................................................................... 14

    II.     THERE ARE NO COMPELLING INTERESTS THAT WOULD
           OVERRIDE THE FIRST AMENDMENT RIGHT OF ACCESS TO THE
           WARRANT MATERIALS ................................................................................ 15

     A.      The Standard To Override The First Amendment Right Of Access Is
           Extremely High......................................................................................... 15

     B.      Any Compelling Interests In Secrecy Can Be Served By Less
           Restrictive Means..................................................................................... 16

           1.      The Fact that the Election Investigations Have Ended
                    Undermines Law Enforcement Interests in Sealing the
                    Warrant Materials ....................................................................... 16

           2.      Any Privacy Interests Are Diminished By the Public Nature of
                    the Election Investigation ............................................................ 17

           3.      Even if Some Law Enforcement and Privacy Interests Rise to
                    the Level of "Compelling," Sealing the Warrant Materials Is
                    Not Narrowly Tailored to Serve Those Interests ......................... 19

    III.    THE PUBLIC INTEREST IN DISCLOSURE OF THE WARRANT
           MATERIALS SIGNIFICANTLY OUTWEIGHS ANY POSSIBLE
           INTEREST IN SECRECY UNDER THE COMMON LAW RIGHT OF
           ACCESS .......................................................................................................... 20

i

A.    Under the Common Law, a Party Seeking to Seal Court Records Must, At a Minimum, Overcome the Strong Presumption in Favor of Public Access to Judicial Records ............................................................ 20

B.    The Public Interest in Disclosure of the Warrant Materials In Highly Public Investigations of Political Corruption is Exceedingly Strong ....... 22

CONCLUSION ..................................................................................................................... 26

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Application for Search Warrant for Email Account*, Mag. No. 10-291-M-01, et al.
(D.D.C. May 23, 2013) .................................................................................................11

*In re Application of N.Y. Times Co. for Access to Certain Sealed Court Records*,
585 F. Supp. 2d 83 (D.D.C. 2008) ..................................................................... *passim*

*In re Application of Newsday, Inc.*,
895 F.2d 74 (2d Cir. 1990)............................................................................................14

*Baltimore Sun Co. v. Goetz*,
886 F.2d 60 (4th Cir. 1989) .............................................................................11, 14, 15

*Buckley v. Valeo*,
424 U.S. 1 (1976)..........................................................................................................24

*Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*,
746 F.3d 1082 (D.C. Cir. 2014) .......................................................................... *passim*

*EEOC v. Nat'l Children's Ctr., Inc.*,
98 F.3d 1406 (D.C. Cir. 1996).....................................................................................21

*Globe Newspaper Co. v. Superior Ct.*,
457 U.S. 596 (1982)......................................................................................................15

*In re Guantanamo Bay Detainee Litig.*,
624 F. Supp. 2d 27 (D.D.C. 2009) ...............................................................................22

*Kimberlin v. Dep't of Justice*,
139 F.3d 944 (D.C. Cir. 1998) .....................................................................................19

*Mills v. Alabama*,
384 U.S. 214 (1966)......................................................................................................24

*Monitor Patriot Co. v. Roy*,
401 U.S. 265 (1971)......................................................................................................23

*Nixon v. Warner Commc'ns, Inc.*,
435 U.S. 589 (1978)................................................................................................14, 22

*Press-Enter. Co. v. Superior Ct.*,
464 U.S. 501 (1984)...................................................................................................2, 15

*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555 (1980) ................................................................................13

*In re Sealed Case*,
    716 F.3d 603 (D.C. Cir. 2013), *cert. dismissed*, 134 S. Ct. 1535
    (Mar. 12, 2014) .......................................................................................5

*In re Sealed Search Warrant*,
    No. 04-M-370(DRH), 2006 WL 3690639 (N.D.N.Y. Dec. 11, 2006) ...................................15

*In re Search of Fair Fin.*,
    692 F.3d 424 (6th Cir. 2012) ...............................................................14

*In re Search Warrant for Secretarial Area Outside Office of Gunn*,
    855 F.2d 569 (8th Cir. 1988) ..................................................11, 12, 13

*In re Search Warrant*,
    No. 00-138M-01 (JMF), 2000 WL 1196327 (D.D.C. July 24, 2000) ...................................15

*In re: Search Warrants Issued on May 21, 1987*,
    No. 87-186, 1990 WL 113874 (D.D.C. July 26, 1990) ........................................15

*In re Special Proceedings*,
    842 F. Supp. 2d 232 (D.D.C. 2012) ......................................................17

*Times Mirror Co. v. United States*,
    873 F.2d 1210 (9th Cir. 1989) ..............................................................14

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*,
    489 U.S. 749 (1989) ..............................................................................22

*United States v. Bus. of Custer Battlefield Museum & Store*,
    658 F.3d 1188 (9th Cir. 2011) .........................................2, 14, 17, 20

*United States v. Eugenia Harris*,
    No. 12-cr-156-CKK ..........................................................................10

*United States v. Hubbard*,
    650 F.2d 293 (D.C. Cir. 1981) .......................................................21, 22

*United States v. Jeffrey Thompson*,
    No. 14-cr-49-CKK .............................................................................10

*United States v. Kott*,
    380 F. Supp. 2d 1122 (C.D. Cal. 2004), *aff'd*, 135 F. App'x 69 (9th Cir. 2005) ............ *passim*

*United States v. Loughner*,
    769 F. Supp. 2d 1188 (D. Ariz. 2011) ............................................12, 13, 17, 23

*United States v. Wells Fargo Bank Account Number 7986104185*,
    643 F. Supp. 2d 577 (S.D.N.Y. 2009)..............................................................................15, 20

*Washington Post v. Robinson*,
    935 F.2d 282 (D.C. Cir. 1991) ...................................................................................16, 19, 20

**Other Authorities**

Fed. R. Crim. P. 41(i).......................................................................................................................11

Local Civil Rule 40.5.........................................................................................................................9

## PRELIMINARY STATEMENT

Through this application, WP Company LLC d/b/a The Washington Post (the "Post")

seeks access to court records concerning specific search warrants issued in connection with the

investigations by the United States Attorney's Office for the District of Columbia (the "USAO")

into campaign finance corruption during the 2010 election of Vincent C. Gray as mayor of the

District of Columbia, and related investigations into Mayor Gray, Jeffrey E. Thompson and

Eugenia C. Harris, the formal conclusion of which was recently announced by the USAO (the

"Election Investigations").  *See* Declaration of Laura R. Handman ("Handman Decl.") Exhibit 24

(Press Release).[1]  Specifically, the Post seeks access to the search warrants, applications,

supporting affidavits, court orders, and returns relating to the Election Investigations

(collectively, the "Warrant Materials").[2]  The Election Investigations had—and continue to

have—a profound impact on D.C. politics, including, by some accounts, directly influencing the

outcome of the 2014 mayoral election.  Unsealing the Warrant Materials will help give residents

of this city critical insight into how these closely-watched and consequential investigations were

carried out by the USAO.

As courts, including in this District, have held, when a law enforcement investigation has

concluded, the public has a qualified right under the First Amendment to access the search

warrant materials connected to the investigation.  *See In re Application of N.Y. Times Co. for*

*Access to Certain Sealed Court Records*, 585 F. Supp. 2d 83, 88 (D.D.C. 2008).  When the First

Amendment right of access attaches to a document, sealing may be maintained only where

closure is "necessitated by a compelling governmental interest, and is narrowly tailored to serve

---

[1] All citations to exhibits to the Handman Decl. will be styled hereinafter as "Ex. __."

[2] References to the "Warrant Materials" with initial capital letters refer to the specific warrant
materials being sought in this case.  References to "warrant materials" without initial capital
letters refer to the same types of documents in other cases.

that interest." *Press-Enter. Co. v. Superior Ct.*, 464 U.S. 501, 510 (1984) ("*Press-Enterprise I*")

(citation omitted); *see also In re N.Y. Times*, 585 F. Supp. 2d at 90.  Courts also consistently hold

that search warrant materials are subject to the common law right of access to judicial records,

which similarly may be denied only where "compelling interests" outweigh the strong

presumption of openness.  *United States v. Bus. of Custer Battlefield Museum & Store* ("*Custer

Battlefield*"), 658 F.3d 1188, 1194 (9th Cir. 2011).

      No such interests exist to keep these documents out of the public eye.  The Election

Investigations have now concluded, and the USAO has expressly stated that no further charges

will be brought.  As all of the parties charged have pled guilty, there is no ongoing investigation

that would be threatened by disclosure of the Warrant Materials now.  Further, any privacy

interests threatened by disclosure are significantly reduced by the fact that the principal targets of

the warrants have been charged and pled guilty.  The one exception is, of course, Mayor Gray

himself.  But though he was never charged with a crime, the fact that he was under investigation

was widely known by the public, and openly acknowledged by Mayor Gray (who has denied any

wrongdoing).

      On the flip side, the public interest in access to these materials could not be stronger.  The

Election Investigations concerned issues at the very core of the First Amendment—the integrity

of the city's elections and its public officials.  Access to the Warrant Materials may help shed

light on a key question of vital public importance that remains unresolved: why the USAO never

brought charges against Mayor Gray, despite sending clear public signals that an indictment was

likely forthcoming.  In a slightly different context, the D.C. Circuit recently emphasized the

"weighty public interest in shining a light on the FBI's investigation of major political corruption

and the DOJ's ultimate decision not to prosecute a prominent [political figure] for any

2

involvement he may have had." *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 746 F.3d 1082, 1092-93 (D.C. Cir. 2014) ("*CREW*").

From the time that the Election Investigations were first publicly discussed in 2011 through the next nearly five years, it was widely understood that the USAO was moving towards indicting Gray, but no indictment was ever brought.  Most prominently, in March 2014, the USAO announced a plea deal with local businessman Jeffrey E. Thompson, the architect of a $653,000 "shadow campaign" to elect Mayor Gray in 2010.  In his plea, Thompson directly implicated Mayor Gray himself in the scheme.  On the day of the Thompson plea, then-U.S. Attorney Ronald C. Machen Jr. gave a press conference where he strongly implied that charges against Mayor Gray himself were imminent.  The announcement of the Thompson plea came just weeks before the 2014 Democratic primary for mayor, which Mayor Gray subsequently lost. Mayor Gray's supporters have stated their belief that the announcement of the Thompson plea deal implicating the mayor caused Mayor Gray to lose the primary.

Now, with the Election Investigations formally concluded, Vincent Gray has announced his return to politics, declaring his intention to run for the Ward 7 seat on the City Council. Accordingly, the need for greater public understanding of the evolution of the Election Investigations lies in much more than idle curiosity or an academic interest in recent history. Public access to these documents—which is mandated by the First Amendment in any event— will help resolve fundamental questions about an investigation that, as the Post's Editorial Board described, "long cast a shadow over the city," and which continues to have profound implications for the future of how politicians in this city are elected to office.

**BACKGROUND**

**A.    Public Interest in the Election Investigations**

From the time the Election Investigations were first announced in March 2011, they have been the subject of intense public interest, fueled in no small part by public statements of the USAO.  *See generally* Ex. 3 (Post Timeline of Gray Investigations ("Timeline")).  In an early public discussion of the probe, then-U.S. Attorney Machen emphasized the broad scope of the investigation, stating that "[i]t's important that people understand no one is above the law, and public officials have to be held to a very high standard."  Ex. 4 at 1.  By October of that year, the Post reported that federal investigators had interviewed several of Mayor Gray's associates and election staff members and "subpoenaed reams of documents."  Ex. 5 at 1.  The initial phase of the investigations culminated in early March 2012 with same-day raids on the homes and offices of Eugenia "Jeanne" Clarke Harris (a public relations consultant who did communications work for Mayor Gray) and of Jeffrey Thompson.  *See* Exs. 6 and 7.

At the time, Thompson was, among other things, the owner of D.C. Chartered Health Plan, which was the city's single-largest contractor, managing the health care of more than 100,000 low-income city residents and collecting more than $300 million in government funds. He was also an influential figure in D.C. politics—a lengthy profile of the businessman was headlined "'The Governor' of D.C."  *See* Ex. 10.  Over the next year, Thompson apparently battled with the government over the return of certain documents seized in the raid that were purportedly beyond the scope of the warrant and/or protected by the attorney client privilege.  He filed two actions under seal that were decided by then-Chief Judge Lamberth, and nearly all of the documents associated with those actions, as well as all Warrant Materials connected to the

March 2012 raids remain under seal.  *See* No. 12-mc-00196-RCL (D.D.C.); No. 12-mc-00197-RCL (D.D.C.).  *See* Ex. 9 (Redacted District Court Decision).[3]

By mid-2012, the Election Investigations began to focus on what was referred to as a "shadow campaign" for Mayor Gray, which was run apart from the official campaign, under which "get out the vote" and other campaign efforts were funded without reporting the expenditures, as would have been required under local campaign finance laws.  The activity was allegedly conducted out of Gray's official campaign headquarters.  *See* Ex. 8.

Over the next two years, more details of the "shadow campaign" became public, as multiple individuals with close ties to Mayor Gray were charged and pled guilty.  *See generally* Ex. 3 (Timeline).  In October 2013, the Post described the Election Investigations as having "defined [Mayor Gray's] tenure."  Ex. 11 at 1.  A poll by the Post in early 2014 found that more than 40 percent of Democrats said that the federal investigation would be a major factor in how they were going to vote in the primary.  *See* Ex. 12 at 3.  During this time U.S. Attorney Machen "took the unusual step of commenting publicly on the status of the investigation and its potential to influence the [then-upcoming] election," but stated that "he would not allow the campaign schedule to dictate his timeline for bringing charges."  *Id.* at 2.[4]

On March 10, 2014, the USAO announced the guilty plea of Jeffrey Thompson, which for the first time directly implicated Mayor Gray as having knowledge of and involvement in the

---

[3] The D.C. Circuit opinion dismissing Thompson's appeal of the district court's denial of his motion was issued in heavily redacted form.  *See In re Sealed Case*, 716 F.3d 603 (D.C. Cir. 2013), *cert. dismissed*, 134 S. Ct. 1535 (Mar. 12, 2014).

[4] As noted in an article in the Post, the timing of a potential plea deal for Jeffrey Thompson was a "tricky matter" for the USAO, in light of a memorandum issued in 2012 by Attorney General Eric Holder regarding the investigation and prosecution of election crimes.  Ex. 12 at 2.  That memorandum advised that "[l]aw enforcement officers and prosecutors may never select the timing of investigative steps or criminal charges for the purpose of affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party."  Ex. 13 at 1.

illegal fundraising operations.  *See* Ex. 16 (Statement of Offense) and 17.  In Thompson's plea before the Court, he stated that the mayor personally asked him to secretly help fund a get-out-the-vote effort on Election Day, among other things.  *See* Ex. 17.  In fact, the documents filed in connection with Thompson's plea referred to Mayor Gray as "Mayoral Candidate A," but Judge Kollar-Kotelly, who is presiding over the prosecutions that have arisen from the Election Investigations, ordered the government to refer to Mayor Gray by name in open court because "references to Mr. Gray and his campaign [we]re not extraneous, but necessary, material, and relevant to Defendant Thompson's plea to conspiracies to violate election laws," and, moreover, "the Government ha[d] already publicly acknowledged that Mr. Gray's mayoral campaign is under investigation."  *See* Ex. 14 (Order) at 2 (citation and quotation marks omitted); Ex. 15.

The day of the Thompson plea, U.S. Attorney Machen gave a press conference stating that the plea "gives the citizens of D.C. an inside look at the underground, off-the-books schemes that have corrupted election after election, year after year." Ex. 17 at 1.  He pledged that his office would "hold accountable all of those who conspired . . . to withhold the truth from the public," and urged Thompson's co-conspirators to "come forward and own up to your conduct." *Id.*  Machen's remarks were widely understood as a signal that Mayor Gray would soon be indicted.  *Id.*; *see also, e.g.,* Ex. 25 at 2 (describing that news conference "appeared to telegraph that the mayor was the office's next target").  Mayor Gray strongly denied the allegations and insisted that Thompson was lying.  *See* Ex. 17.

Less than three weeks after Thompson's guilty plea, Mayor Gray lost the Democratic primary to the current mayor, Muriel Bowser.  Mayor Gray's supporters—and Mayor Gray himself—have publicly stated that the announcement of Thompson's plea on what became

known to some as "Machen Monday" directly caused his loss.[5]  *See* Ex. 19; *see generally* Ex. 3

(Timeline).

Between the announcement of the Thompson plea implicating Mayor Gray in March

2014 and the formal conclusion of the Election Investigations in December 2015, the public was

left wondering whether and when charges would be filed against the mayor, and, if charges

would not be filed, then why not.  (In November 2014, Gray apparently rejected a plea deal

proposed by the USAO.  *See* Ex. 20.)  In February 2015, the Post published an editorial

headlined "Make the case against Vincent Gray—or let him off the hook," stating that eleven

months after the Thompson plea, "D.C. residents—not to mention Mr. Gray—are still waiting

for resolution of a case that has long cast a shadow over the city," and noting that "[f]ailure to

bring closure to this inquiry increasingly has implications for the credibility of [the USAO]."

Ex. 21 at 1.  The next month, when Ronald Machen stepped down as U.S. Attorney to return to

private practice, the Post published an editorial emphasizing that Machen was "leaving behind

unfinished business," explaining:

> The lack of any visible developments over the last year has left the
> city and Mr. Gray hanging as questions have mounted.  Were
> prosecutors right to have accepted Mr. Thompson's plea just weeks
> before the primary that saw Mr. Gray defeated in his bid for
> reelection?  What agreement did prosecutors offer to Mr. Gray?
> Why didn't they follow up with an indictment?  Shouldn't
> prosecutors either make a case against Mr. Gray or acknowledge
> they lack the evidence to do so?

Ex. 22 at 1.  This past September, the Post published an editorial whose headline simply pleaded

"Make a decision on charging Vincent Gray."  Ex. 23; *see also id.* at 1 ("Prosecutors have made

---

[5] In fact, a week before the primary, one Gray supporter filed a formal complaint with the D.C.
Bar Association alleging that Machen violated professional ethics by timing the announcement
of Thompson's plea (and the implication of Mayor Gray) to improperly interfere with the
election.  *See* Ex. 18.  The day of the election Marion Barry, a Gray supporter, published a tweet
stating "Ron Machen decided this election."  Ex. 19 at 1.

clear they believe Mr. Gray, who has denied any wrongdoing, violated the law. . . . It's time to indict and go to trial, or explain why not.").

Finally, on December 9, 2015, almost five years after the Election Investigations began, the USAO suddenly announced that the probe was over, and no further charges would be filed—against Mayor Gray or anyone else.  *See* Ex. 24 (Press Release); Ex. 25.  The press release announcing the termination of the investigations did not explain the reasoning behind the decision beyond a boilerplate statement that "based on a thorough review of the available evidence and applicable law, the U.S. Attorney's Office has concluded that the admissible evidence is likely insufficient to obtain and sustain a criminal conviction against any other individuals related to the federal and local political campaigns."  Ex. 24 at 1.

In the days that followed, Mayor Gray asserted that the prosecutors owed him an apology.  He publicly reaffirmed his belief that he would still be mayor if it were not for "Machen Monday," and accused the USAO of effectively engaging in "voter suppression" by announcing Thompson's guilty plea implicating Mayor Gray so soon before the election.  Ex. 27 at 1.  Earlier this month, Gray announced his return to D.C. politics, stating that he planned to run for the Ward 7 seat on the City Council.  *See* Exs. 28 and 29.  Jeffrey Thompson's sentencing is scheduled to take place four days before the Democratic primary for that race.  *See* Ex. 29; Dkt. No. 44, No. 14-cr-449-CKK (Dec. 17, 2015).

Although Mayor Gray has maintained his innocence of any crime, the public remains in the dark about exactly what evidence the USAO had—or thought it had—implicating Mayor Gray, and why he was never charged.  As the Post's Editorial Board summarized on the day that the Election Investigations concluded, the end of the investigations "raises a new set of unsettling questions":

8

> Foremost: If prosecutors still believe, as they alleged in a plea
> agreement reached last year with businessman Jeffrey E.
> Thompson, that Mr. Gray had knowledge of an illegal $653,000
> "shadow campaign" funded by Mr. Thompson and executed by
> Mr. Gray's close associates, why wasn't the former mayor charged
> so that a jury could decide on his culpability?  Or if prosecutors
> have concluded that Mr. Thompson is not credible, why proceed
> with a plea agreement that gives the once-prominent businessman
> no more than six months in prison, rather than the seven years he
> faced for helping to corrupt not just the 2010 election but also
> previous campaigns?

Ex. 26 at 1.

Disclosure of the Warrant Materials will help shed significant light on a lengthy series of highly public investigations that had significant, direct impact on D.C. politics, and will provide the public with valuable insight into how the USAO carried out its responsibilities to investigate these critical issues.

### B.     Procedural Posture

Soon after the Election Investigations concluded, Post reporter Ann Marimow, who has reported extensively on the Election Investigations, filed a request with the USAO under the Freedom of Information Act ("FOIA") seeking access to the Warrant Materials.  *See* Ex. 1.  On January 27, 2016, the Executive Office for United States Attorneys informed Marimow that it had confirmed that the Warrant Materials were "located and remain under seal at the U.S. District Court, not at the USAO-DC," and closed the requests on those grounds.  *See* Ex. 2.  The Post now brings this action.

The Post has filed this action as a miscellaneous case potentially related under Local Criminal Rule 57.6 and Local Civil Rule 40.5 to two sets of actions in this District:

(1) *In re: Sealed Case* (*Thompson, Cobb, Bazilio & Associates, PC & Jeffrey Thompson v. United States*), Nos. 12-mc-196-RCL and 12-mc-197-RCL:  These two miscellaneous cases were filed by Thompson seeking the return of materials seized during the raid on his home and

office.  Although those actions are now closed following dismissal by Judge Lamberth, they

directly concerned at least some of the Warrant Materials, and therefore involve some common

issues of fact and grow out of some of the same events or transactions.  The docket sheets in

these cases were unsealed on motion of the government (at the request of the Post) in March

2014, after Thompson pleaded guilty.  Nearly all other documents in these cases remain under

seal.

   (2) *United States v. Jeffrey Thompson*, No. 14-cr-49-CKK; *United States v. Eugenia*

*Harris*, No. 12-cr-156-CKK:  Although the Warrant Materials were filed under separate (sealed)

docket numbers, the ultimate result of the searches authorized by those warrants are the guilty

pleas currently pending before Judge Kollar-Kotelly, and therefore also involve common issues

of fact and grow out of the same events or transactions.  Sentencings of Thompson and Harris are

scheduled for June 10, 2016 and July 8, 2016, respectively, before Judge Kollar-Kotelly, with

other defendants charged in the Election Investigations set to be sentenced on various dates in

May through July of this year.  *See* Dkt. No. 44, No. 14-cr-49-CKK (D.D.C. Dec. 17, 2015); Dkt.

No. 53, No. 12-cr-156-CKK (D.D.C. Dec. 17, 2015).

## ARGUMENT

I. **THE PUBLIC HAS A QUALIFIED RIGHT OF ACCESS TO THE SEALED WARRANT MATERIALS UNDER BOTH THE FIRST AMENDMENT AND THE COMMON LAW**

   Given that the Election Investigations have now formally concluded, the public has a

qualified right to inspect the Warrant Materials under both the First Amendment and the

common law presumption of access to judicial records.

### A. There is a First Amendment Right of Access to Search Warrant Materials

   In *In re New York Times*, then-Chief Judge Lamberth squarely held that the public has a

qualified First Amendment right of access to search warrant materials after an investigation has

been completed.  585 F. Supp. 2d at 90.  In that case, which involved a motion by a newspaper to

unseal the warrant materials connected to the FBI's investigation of the anthrax attacks that

followed the  9/11 terrorist attacks, the court reached its conclusion by applying the "experience"

and "logic" test used by the Supreme Court to determine whether the First Amendment right of

access applies.  Under this test, courts analyze two factors: "(1) whether the place and process

have historically been open to the press and general public, and (2) whether 'public access plays

a significant positive role in the functioning of the particular process in question.'"  *Id.* at 87

(quoting *Press-Enter. Co. v. Superior Ct.*, 478 U.S. 1, 8-9 (1986) ("*Press-Enterprise II*")).

The court readily concluded that "post-investigation warrant materials . . . have

historically been available to the public, and therefore meet the first prong of the Supreme

Court's First Amendment qualified right of access test."  *Id.* at 88.  Although the process of

applying for a search warrant is *ex parte*, and often under seal, under Rule 41 of the Federal

Rules of Criminal Procedure, after the warrant's execution, the warrant, return, inventory and

"all other related papers" are filed with the clerk of the court.  Fed. R. Crim. P. 41(i).  Indeed, the

"routine practice" in this Court is "to make warrant materials publicly available after a search has

been executed and a return is available."  *In re N.Y. Times*, 585 F. Supp. 2d at 88 n.8.[6]  *See also*

*Baltimore Sun Co. v. Goetz*, 886 F.2d 60, 64 (4th Cir. 1989) ("Frequently—probably most

frequently—the warrant papers including supporting affidavits are open for inspection by the

press and public in the clerk's office after the warrant has been executed."); *In re Search*

---

[6]In fact, several years ago when it was discovered that warrant materials that had been ordered
unsealed had remained under seal because of administrative errors in the clerk's office, then-
Chief Judge Lamberth issued an order formally apologizing to the public for the error and
establishing mechanisms to assure that the public would have access to warrant materials on the
court's website once they were unsealed.  *See* Ex. 30 (Memorandum and Order, *Application for
Search Warrant for Email Account*, Mag. No. 10-291-M-01, et al. (D.D.C. May 23, 2013)); *see
also* Ex. 31.

*Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569, 573 (8th Cir. 1988)

("[S]earch warrant applications and receipts are routinely filed with the clerk of court without

seal.").  As the court further recognized (and the government in that case conceded), there is also

a common law right of access to warrant materials, which further "weighs strongly in favor of a

First Amendment qualified right of access."  *In re N.Y. Times*, 585 F. Supp. 2d at 89.  *See also*

*United States v. Loughner*, 769 F. Supp. 2d 1188, 1193 (D. Ariz. 2011) ("The Court is persuaded

by the clear trend among the states during the past 30 years that experience supports finding a

qualified First Amendment right of access to search warrant materials once the investigation has

concluded and a final indictment has issued.").

The court in *In re N.Y. Times* also readily concluded that the "logic" factor weighed

strongly in favor of a First Amendment right of access because, "with respect to warrants,

openness plays a significant positive role in the functioning of the criminal justice system, at

least at the post-investigation stage."  585 F. Supp. 2d at 90.  The court observed that "warrant

materials are often used to adjudicate important constitutional rights such as the Fourth

Amendment protection against unreasonable searches and seizures," and that "[p]ublic access to

warrant materials serves as a check on the judiciary because the public can ensure that judges are

not merely serving as a rubber stamp for the police."  *Id.*  *See also Gunn*, 855 F.2d at 573

("[P]ublic access to documents filed in support of search warrants is important to the public's

understanding of the function and operation of the judicial process and the criminal justice

system and may operate as a curb on prosecutorial or judicial misconduct.").  As the Supreme

Court noted in discussing the value of judicial openness generally, "[p]eople in an open society

do not demand infallibility from their institutions, but it is difficult for them to accept what they

12

are prohibited from observing." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980).

The positive role that public access to search warrant materials would play in a case like this, where the public remains in the dark about the evolution of a high profile, long running investigation that has now concluded, was specifically acknowledged by the court in *United States v. Kott*, 380 F. Supp. 2d 1122 (C.D. Cal. 2004), *aff'd*, 135 F. App'x 69 (9th Cir. 2005). There, a newspaper moved to unseal the FBI affidavit in support of an application for a search warrant in a securities fraud investigation. As in this case, the initial characterization of the investigation was inconsistent with the ultimate result of the prosecution. In the underlying criminal case in *Kott*, "after an extended and extensive investigation of numerous individuals and companies, a 48-count indictment was handed down by the Grand Jury, [but] [u]ltimately only one defendant pleaded to two counts in a Superseding Information, received a probationary sentence, served no time in custody, and the Indictment was dismissed." *Id.* at 1124. As the court explained, "[n]o doubt perfectly legitimate reasons exist to explain the disparity between the original Indictment and the ultimate result, but the public will be unable to learn what they are unless it is armed with enough information to know what questions to ask." *Id.* The case was thus a "classic example of the case in which 'logic' compels disclosure." *Id.* at 1125. This case is no different.

The court's holding in *In re N.Y. Times* that the First Amendment provides a right of access to search warrant materials after an investigation has concluded was correct, and is consistent with the reasoning of other courts to consider the question. *See Gunn*, 855 F.2d at 573 (holding that First Amendment right of access applies to "documents filed in support of search warrant applications"); *Loughner*, 769 F. Supp. 2d at 1191-92 (finding First Amendment right of

access to search warrant materials where "the active investigation has now concluded and a final

indictment has issued," because "[t]here is no real danger at this point that disclosure of the

warrant materials will jeopardize the investigation or hamper the ability of the grand jury to

determine the appropriate charges"); *Kott*, 380 F. Supp. 2d at 1124 (finding First Amendment

right of access, and noting that at "post-indictment or post-plea" stage, "there is no need for

continued secrecy"), *aff'd*, 135 F. App'x 69 (9th Cir. 2005) (affirming on common law

grounds).[7]  Accordingly, as in *In re N.Y. Times*, the public has a First Amendment right to access

the Warrant Materials.

### B.    There Is a Common Law Right to Inspect Judicial Records, Including Search Warrant Materials

In addition to the right of access under the First Amendment, the Warrant Materials are

indisputably subject to the common law right to "inspect and copy public records and

documents, including judicial records and documents."  *Nixon v. Warner Commc'ns, Inc.*, 435

U.S. 589, 597 (1978) (footnote omitted).  In *In re N.Y. Times*, the government expressly

conceded that warrant materials were "judicial records" subject to the common law presumption

of access.  *See* 585 F. Supp. 2d at 89.  Courts, including in this district, have consistently reached

the same conclusion (even in cases where the court declined to reach the question whether a First

Amendment right applied).  *See Custer Battlefield*, 658 F.3d at 1192; *In re Application of*

---

[7] Other court decisions have held that there is no First Amendment right of access to search warrant materials in cases *where the underlying investigation was still ongoing*, and are thus inapposite to this case (as they were to *In re N.Y. Times*).  *See, e.g.*, *Goetz*, 886 F.2d at 62; *Times Mirror Co. v. United States*, 873 F.2d 1210, 1221 (9th Cir. 1989).  Recently, in *Custer Battlefield*, the Ninth Circuit held that the common law right of access applied to warrant materials after an investigation had concluded, but expressly declined to reach the constitutional question whether the First Amendment right applied.  658 F.3d at 1196-97.  Only the Sixth Circuit has held that there is no First Amendment right of access after an indictment has issued, but that outlier decision has never been cited for that proposition by any other court.  *See In re Search of Fair Fin.*, 692 F.3d 424 (6th Cir. 2012).

*Newsday, Inc.*, 895 F.2d 74, 79 (2d Cir. 1990); *Goetz*, 886 F.2d at 62; *United States v. Wells Fargo Bank Account Number 7986104185*, 643 F. Supp. 2d 577, 583-84 (S.D.N.Y. 2009); *In re Search Warrant*, No. 00-138M-01 (JMF), 2000 WL 1196327, at *2 (D.D.C. July 24, 2000); *In re: Search Warrants Issued on May 21, 1987*, No. 87-186, 1990 WL 113874, at *3 (D.D.C. July 26, 1990). Indeed, courts hold that, because affidavits in support of search warrants are "central to a court's probable cause determination," which adjudicates the target of the warrant's "substantive rights," the presumption of access to those materials under the common law is "entitled to great weight." *Wells Fargo*, 643 F. Supp. 2d at 583-84 (citing *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995)). *See also In re Sealed Search Warrant*, No. 04-M-370(DRH), 2006 WL 3690639, at *3 (N.D.N.Y. Dec. 11, 2006) (holding that, for same reason, the presumption of access attaching to search warrant materials "falls at the highest end of the continuum . . . and carries the maximum possible weight").

## II.      THERE ARE NO COMPELLING INTERESTS THAT WOULD OVERRIDE THE FIRST AMENDMENT RIGHT OF ACCESS TO THE WARRANT MATERIALS

### A.      The Standard To Override The First Amendment Right Of Access Is Extremely High

Where the First Amendment right of access attaches, the government (or whichever party is seeking to prevent disclosure) must show that sealing serves a compelling governmental interest and is narrowly tailored to serve that interest. *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596, 606-07 (1982). As the Supreme Court has explained, "[t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure was properly entered." *Press-Enterprise I*, 464 U.S. at 509-10. The D.C. Circuit has articulated this standard as a three-prong test, where the presumption of access can be overcome

15

only if the party opposing disclosure shows that "(1) closure serves a compelling interest; (2) there is a substantial probability that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives to closure that would adequately protect the compelling interest." *Washington Post v. Robinson*, 935 F.2d 282, 290 (D.C. Cir. 1991) (citation omitted). These standards cannot be met in this case, and thus the Warrant Materials must be unsealed.

**B.      Any Compelling Interests In Secrecy Can Be Served By Less Restrictive Means**

Although courts have justified sealing warrant materials to preserve law enforcement interests and the privacy of individuals named in the warrants, neither of those factors rises to the level of a "compelling interest" under the circumstances of this case.  And any residual compelling interests in secrecy for either law enforcement or privacy purposes can be served by less restrictive means than a blanket sealing of the Warrant Materials.

**1.      The Fact that the Election Investigations Have Ended Undermines Law Enforcement Interests in Sealing the Warrant Materials**

Perhaps the most significant reason that there is no government interest—let alone a compelling government interest—in maintaining all of the Warrant Materials under seal is that the Election Investigations have officially concluded.  The USAO publicly announced that all twelve of the individuals charged in connection with the investigation have pled guilty, and "[n]o additional charges are expected to be filed" in connection with the investigation.  Ex. 25. Although courts have generally held that secrecy is important before a search warrant is executed (so as not to "tip off" the target of the search and risk the destruction or concealment of evidence), courts also consistently recognize that those concerns are not implicated when the search warrant has been executed, charges have been brought, and guilty pleas have been entered.  In short, "once the investigation has concluded and a final indictment has issued . . . there is no danger of corrupting the investigation or interfering with grand jury proceedings."

*Loughner*, 769 F. Supp. 2d at 1193.  *See In re N.Y. Times*, 585 F. Supp. 2d at 93 (holding that

"there is no possibility of prejudice in releasing the documents" where "the investigation is

complete and therefore is not in danger of being thwarted if the Court releases the documents");

*Custer Battlefield*, 658 F.3d at 1194 (explaining that concerns about disclosure of warrant

information during an ongoing criminal investigation "are not as relevant once an investigation

has been terminated," and holding that common law right of access therefore applied to require

access).  Accordingly, any law enforcement interests in maintaining the Warrant Materials under

seal are minimal and would not be sufficient to override the First Amendment right of access.

> **2.      Any Privacy Interests Are Diminished By the Public Nature of the Election Investigation**

The most obvious privacy interests implicated by disclosure of the Warrant Materials

belong to (1) Jeffrey Thompson and Eugenia Harris, who were charged in connection with the

Election Investigations; and (2) Mayor Gray, who was a subject of the investigation but was

never charged.  But both sets of privacy interests are undermined by several factors, and, in any

event, do not justify maintaining the Warrant Materials under seal in their entirety.

As an initial matter, courts hold that general "privacy and reputational concerns typically

don't provide sufficient reason to overcome a qualified First Amendment right of access."

*Loughner*, 769 F. Supp. 2d at 1196 (citing *In re N.Y. Times*, 585 F. Supp. 2d at 93 n.14 (citing *In re McClatchy Newspapers, Inc.*, 288 F.3d 369, 374 (9th Cir. 2002) (stating in a common law

right of access case that "injury to official reputation is an insufficient reason for repressing

speech that would otherwise be free"))); *see also In re Special Proceedings*, 842 F. Supp. 2d 232,

245 (D.D.C. 2012) (holding that prosecutors' "privacy and reputational interests" did not

constitute a "compelling interest that would meet their high burden to justify keeping the Report

[of an investigation into possible prosecutorial misconduct] under seal" under First Amendment).

Moreover, the privacy interests of Thompson and the other charged parties are further diminished by the fact that they have already been charged with (and pleaded guilty to) the crimes that were investigated in the Election Investigations.  In this exact context, courts have expressed strong skepticism of the notion that a "defendant has a right of privacy with respect to a case in which he was indicted and criminal proceedings were instituted against him."  *Kott*, 380 F. Supp. 2d at 1125.

Although that reasoning does not apply to Mayor Gray, who was never officially charged with any crime, the fact that he was a target in the Election Investigations was widely acknowledged, including by Mayor Gray himself.  (It was for this reason that Judge Kollar-Kotelly ordered the government to refer to Mayor Gray by name in open court during Jeffrey Thompson's plea hearing.  *See* Ex. 14.)  Throughout the Election Investigations, Mayor Gray gave interviews and made numerous public statements about the Election Investigations in which he loudly asserted his innocence.  *See, e.g.*, Ex. 17; Ex. 3 (Timeline).  The fact that he was suspected of committing crimes is not a secret—indeed, Mayor Gray himself has directly blamed his primary loss in 2014 on the announcement of these suspicions by the USAO.  As recently as this month, in announcing his campaign for a city council seat, Gray again discussed the Election Investigations and the effect they had on his defeat.  *See* Ex. 29.  Under such circumstances, Gray's privacy interests are significantly reduced, and do not rise to the level necessary to defeat the First Amendment right of access.  *Cf. CREW*, 746 F.3d at 1092 (holding in FOIA context that a politician's "obvious privacy interest in keeping secret the fact that he was the subject of an FBI investigation was diminished by his well-publicized announcement of that very fact") (citing, *inter alia*, *Kimberlin v. Dep't of Justice*, 139 F.3d 944, 949 (D.C. Cir. 1998) (prosecutor's public acknowledgment that he was subject of disciplinary proceedings

"undoubtedly does diminish his interest in privacy: the public already knows who he is, what he was accused of, and that he received a relatively mild sanction"); *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 896 (D.C. Cir. 1995) (politician waived right to have his name redacted from responsive documents regarding events he publicly discussed))).[8]

> **3.      Even if Some Law Enforcement and Privacy Interests Rise to the Level of "Compelling," Sealing the Warrant Materials Is Not Narrowly Tailored to Serve Those Interests**

Protection of limited categories of information contained in the Warrant Materials may rise to the level of compelling interests, but there are ample "alternatives to [sealing the Warrant Materials] that would adequately protect" those interests.  *Robinson*, 935 F.2d at 290.

For example, even though the Election Investigations have concluded, the Warrant Materials may contain the identities of confidential informants whose disclosure now would jeopardize other ongoing investigations (or the personal safety of the informants).  Although that scenario seems unlikely here, protecting the identities of the confidential informants could rise to the level of a compelling interest.  However, as in *In re N.Y. Times*, "the goal of protecting the confidentiality of informants can be accomplished by means less restrictive than prohibiting access to the warrant materials altogether."  585 F. Supp. 2d at 91.  In that case, the court held that "that interest can be accomplished by simply redacting the identity and personal identifiers of the informants," which the court directed the government to do.  *Id.*  The Post does not object to similarly narrow redactions of that type of information upon the requisite showing by the government.

---

[8] As a government official, Mayor Gray may inherently have a "'somewhat diminished' privacy interest," though courts are careful to note that individuals "do not surrender all rights to personal privacy when they accept a public appointment."  *Kimberlin*, 139 F.3d at 949 (citation omitted).

Disclosure of the Warrant Materials may also reveal the identities of other innocent third parties whose involvement in the Election Investigations is not publicly known.  Courts have acknowledged that "a search warrant affidavit will, of necessity, contain detailed explanations of the suspected involvement of all persons named in the affidavit," and held that "[t]he danger of unfounded character assassination in this context is not sufficient to constitute a compelling governmental interest in maintaining the secrecy of the documents."  *Kott*, 380 F. Supp. 2d at 1125.  In any event, to the extent that compelling privacy interests of unrelated innocent third parties would be compromised by disclosure of the Warrant Materials, the identities of those third parties can also be redacted.

Overall, however, there is no interest in maintaining the Warrant Materials under seal in full that could override the First Amendment right of access.

## III.     THE PUBLIC INTEREST IN DISCLOSURE OF THE WARRANT MATERIALS SIGNIFICANTLY OUTWEIGHS ANY POSSIBLE INTEREST IN SECRECY UNDER THE COMMON LAW RIGHT OF ACCESS

### A.     Under the Common Law, a Party Seeking to Seal Court Records Must, At a Minimum, Overcome the Strong Presumption in Favor of Public Access to Judicial Records

Courts often observe that the First Amendment provides "different and heightened protections of access . . . over common law rights." *Robinson*, 935 F.2d at 288 n.7.  However, with respect to warrant materials, courts in other circuits have suggested that, no different than under the First Amendment, even under the common law right of access, a court must "order disclosure absent *compelling* reasons to deny access and even then must employ *the least restrictive possible means* of doing so." *Wells Fargo*, 643 F. Supp. 2d at 585 (emphases added); *see also Custer Battlefield*, 658 F.3d at 1194-95 (explaining, in context of search warrant affidavits, that the party seeking to maintain the seal "bears the burden of overcoming th[e] strong presumption [of access] by . . . articulat[ing] compelling reasons . . . that outweigh the

general history of access and the public policies favoring disclosure") (internal quotation marks and citation omitted).

In this Circuit, courts have not gone as far, but have emphasized that "the starting point in considering a motion to seal court records is a strong presumption in favor of public access to judicial proceedings." *EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996) (internal quotation marks and citation omitted). In determining whether that strong presumption has been overcome, courts in this Circuit generally look to the factors originally set forth by the D.C. Circuit in *United States v. Hubbard*, 650 F.2d 293, 317-22 (D.C. Cir. 1981):

> (1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial proceedings.

*Nat'l Children's Ctr.*, 98 F.3d at 1409.

None of these factors weighs against disclosure of the Warrant Materials, and as set forth in detail below, Factor (1) strongly favors disclosure, and would outweigh any countervailing interests. Factor (2) also weighs in favor of access: although the public did not have access to the documents themselves, the fact that people like Jeffrey Thompson or Vincent Gray were the subjects of a criminal investigation is well known and not in dispute. Because no party has yet come forward to object to disclosure, it is impossible to assess Factors (3) and (4). Factor (5) favors disclosure for the same reasons that no compelling reasons exist to override the First Amendment right of access. *See supra* Section II.B. Indeed, there is a particularly low risk of prejudice since all of the parties who have been charged have pled guilty and the USAO has made clear that no further charges will be brought. As the court noted in *In re N.Y. Times*, Factor

(6) was specific to the facts of *Hubbard* and is not relevant to whether warrant materials should be disclosed.

> **B.    The Public Interest in Disclosure of the Warrant Materials In Highly Public Investigations of Political Corruption is Exceedingly Strong**

Given the intense public interest in the Election Investigations generally, and the fact that the investigations implicated the highest levels of government in the city and arguably swung a mayoral election, the public interest in access to the Warrant Materials is exceedingly high. The fact that Vincent Gray has announced his return to politics only heightens the pressing public need to understand what happened in the Election Investigations. Thus, even if the First Amendment right of access did not apply to the Warrant Materials (and it does), the public interest in access under the common law would significantly outweigh any interests in secrecy.

The Supreme Court has explained that the public interest in access to government records is justified by "the citizen's desire to keep a watchful eye on the workings of public agencies, and in a newspaper publisher's intention to publish information concerning the operation of government." *Nixon*, 435 U.S. at 598 (internal citations omitted). And courts have long recognized the strong public interest in understanding law enforcement policy and operations generally. *See, e.g.*, *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 766 n.18 (1989) ("[M]atters of substantive law enforcement policy . . . are properly the subject of public concern."); *CREW*, 746 F.3d at 1093 ("[W]e have repeatedly recognized a public interest in the manner in which the DOJ carries out substantive law enforcement policy . . . ."). [9] All of these interests would be served by access to the Warrant Materials here.

---

[9] *Cf. In re Guantanamo Bay Detainee Litig.*, 624 F. Supp. 2d 27, 34-39 (D.D.C. 2009) (holding that First Amendment right of access attached to factual returns in habeas proceedings for Guantanamo Bay inmates, explaining that "[p]ublic interest in Guantanamo Bay generally and these proceedings specifically has been unwavering," but "[t]he public's understanding of the proceedings, however, is incomplete without the factual returns," and disclosure would

Courts have specifically acknowledged the critical role that access to warrant materials plays in the public's understanding of the workings of law enforcement agencies and the criminal justice system, particularly in high profile investigations.  In *In re N.Y. Times*, the court held that "the public ha[d] a strong need for access" to the warrant materials connected to the anthrax investigation.  As the court explained (and as the government conceded), "the anthrax investigation was one of the most complex, time-consuming, and expensive investigations in recent history," and "[a]s a result, the American citizens have a legitimate interest in observing and understanding how and why the investigation progressed in the way that it did."  585 F. Supp. 2d at 92-93.  In *Loughner*, which concerned warrant materials connected to the Tucson mass shooting in which Congresswoman Gabrielle Giffords was wounded, the court held that the First Amendment right of access applied, noting that,

> broadly speaking, society has a valid and understandable interest in the law enforcement system and how well it works.  Permitting inspection of the search warrants, the accompanying affidavits, and the property inventory will further public understanding of the response of government officials to the Tucson shootings, and allow the public to judge whether law enforcement functioned properly and effectively under the hectic circumstances of that day.

769 F. Supp. 2d at 1194.  *See also id.* ("Public scrutiny of the search warrant process—even after the fact—can shed light on how and why a warrant was obtained, and thereby further the public's interest in understanding the justice system.").

Where, as here, an investigation concerns the integrity of elected officials—and the integrity of the process of electing those officials—the First Amendment interests in disclosure are at their absolute highest.  *See Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971) ("[I]t can hardly be doubted that the constitutional guarantee [of free speech] has its fullest and most

---

"enlighten the citizenry and improve perceptions of the proceedings' fairness").

urgent application precisely to the conduct of campaigns for political office."); *Mills v. Alabama,* 384 U.S. 214, 218-19 (1966) ("[T]here is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs.  This of course includes discussions of candidates . . . and all such matters relating to political processes."); *see also Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (*per curiam*) ("Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression . . . .").

The D.C. Circuit recently reaffirmed the importance of public access to information about political corruption investigations in a FOIA case that raised issues strikingly similar to this one. In *CREW*, the requester sought records related to the FBI investigations of corruption connected to lobbyist Jack Abramoff and Rep. Tom DeLay, the former Majority Leader of the U.S. House of Representatives.  746 F.3d 1082.  Although the investigation resulted in almost two dozen guilty pleas or convictions, including senior aides to Rep. DeLay, and DeLay was a target of the probe, he was ultimately not charged with any crime.  In weighing the interests in secrecy versus disclosure, the court acknowledged the "weighty public interest in shining a light on the FBI's investigation of major political corruption and the DOJ's ultimate decision not to prosecute a prominent member of the Congress for any involvement he may have had."  *Id.* at 1092-93. Disclosure of the materials at issue would "shed light on how the FBI and the DOJ handle the investigation and prosecution of crimes that undermine the very foundation of our government. . . . That the investigation implicated a public official as prominent as the former Majority Leader of the House of Representatives further raise[d] the stakes."  *Id.* at 1093, 1094.

24

This case is essentially the municipal version of *CREW*.  As in that case, the DOJ undertook a lengthy, high profile investigation of corruption at the highest levels of (in this case, local) government.  However, although the investigations circled around a prominent political figure, including by securing guilty pleas of some of the politician's closest aides, at the conclusion of the investigations, the politician was not charged with a crime and the public was left to wonder "about the diligence of the FBI's investigation and the DOJ's exercise of its prosecutorial discretion: whether the government had the evidence but nevertheless pulled its punches." *Id.* at 1093.  Similarly, as in the securities fraud investigation in *Kott*, "[n]o doubt perfectly legitimate reasons exist to explain the disparity between the original [presentation of the investigation] and the ultimate result, but the public will be unable to learn what they are unless it is armed with enough information to know what questions to ask." 380 F. Supp. 2d at 1124.

The questions raised by the Post's Editorial Board during and after the Election Investigations underscore the vital public interest in access to the Warrant Materials.  *See* Exs. 21, 22, 23 and 26.  In particular, if Thompson's guilty plea were truthful—and the USAO presumably believes it was or it would not be moving forward with the plea—and it directly implicated Mayor Gray in wrongdoing, then why was Mayor Gray never charged?  And since Mayor Gray is not being charged, where does that leave Thompson's plea deal, and how will it affect his sentencing (which is set to take place four days before the primary election in which Gray is running for City Council)?  What evidence did the USAO uncover during the Election Investigations that suggested Mayor Gray's guilt or innocence, and depending on the nature of that evidence, why did the USAO make public statements plainly suggesting that it intended to charge a sitting public official up for reelection with a crime?  Unsealing the Warrant Materials

will allow the public to better follow how the USAO conducted the Election Investigations, and

possibly shed light on these vexing—and extremely important—questions.

## CONCLUSION

The public has a right to access the Warrant Materials under both the First Amendment

and the Common Law.  No compelling interests exist that would justify the continued sealing of

the Warrant Materials in their entirety.  And the strong public interest in understanding more

about the now concluded Election Investigations significantly outweighs any possible interests in

keeping the Warrant Materials secret.  Accordingly, the Post requests that the Court enter an

order unsealing the Warrant Materials relating to the Election Investigations.

Dated:   Washington, D.C.
         February 19, 2016

                         Respectfully submitted,

                         DAVIS WRIGHT TREMAINE LLP

                         By

                             Laura R. Handman
                             Eric J. Feder (*pro hac vice* pending)

                         1919 Pennsylvania Avenue NW, Suite 800
                         Washington, D.C. 20006
                         Tel: (202) 973-4200
                         Fax: (202) 973-4499
                         Email: laurahandman@dwt.com
                         Email: ericfeder@dwt.com

                         *Attorneys for Petitioner the WP Company d/b/a The
                         Washington Post*